Gerald Theodore SMITH and John Lee Emery, a/k/a Robert Lee Lomax, a/k/a John Lee Gray, Appellants,

v.

The STATE of Oklahoma, Appellee.

Nos. F–77–640 and F–77–641.

Court of Criminal Appeals of Oklahoma.

June 27, 1978.

---

4. *Sadberry v. Hope*, 444 P.2d 175 (Okl.1968).

5. *Crockett v. Root*, 194 Okl. 3, 146 P.2d 555 (1943).

6. *Sautvine v. Keller*, 423 P.2d 447 (Okl.1966).

Frank H. McCarthy, Asst. Public Defender, Tulsa County, Tulsa, for appellants.

Larry Derryberry, Atty. Gen., Bill J. Bruce, Asst. Atty. Gen., Clifford E. Briery, II, Legal Intern, for appellee.

## OPINION

BRETT, Judge:

Appellants, Gerald Theodore Smith and John Lee Emery, also known as Robert Lee Lomax, also known as John Lee Gray, hereinafter referred to as defendants, were jointly charged in the District Court, Tulsa, Case No. CRF-76-3183, with Kidnapping, in violation of 21 O.S.1971, § 741. Additionally, defendant Emery was charged After Former Conviction of a Felony, 21 O.S. Supp.1977, § 51. The case was tried to a jury, and both defendants were convicted. Defendant Smith received a three (3) year term and defendant Emery received a thirty-eight (38) year term. Both defendants have perfected appeals to this Court, which have been consolidated.

The State's case in chief consisted of the testimony of Debbie Martin and Kenneth McDaniel, both of whom were kidnapped by the defendants. However, the charge herein relates to the kidnapping of Ms. Martin only.

Ms. Martin testified that she roomed with Mr. McDaniel and two other persons and that on November 24, 1976, at about 6:00 p. m., she and Mr. McDaniel were in their apartment sleeping when they were roused by a knock at the door. Immediately afterwards, both defendants entered, one of whom was carrying a sawed-off shotgun. Conversation was had and the defendants remained about half an hour, during which time Ms. Martin noticed that there were numerous police cars and officers on the street. Subsequently, when the police left both defendants entered the bedroom where they had a "conference." Defendant Smith then came into the living room carrying the shotgun and stated, "Sorry, I hate to do this, but you have to go with us." They left the apartment in pairs, Ms. Martin and defendant Emery leaving first and McDaniel and defendant Emery following about two and a half minutes later. They went to a house about one and a half blocks away where Ms. Martin and McDaniel were forced to remain all night, not being released until approximately 4:30 a. m.

Kenneth McDaniel's testimony corroborated that of Ms. Martin.

Since neither defendant contests the sufficiency of the evidence, we will consider the defendants' evidence only insofar as it may relate to a particular assignment of error.

Both defendants raise four assignments of error on appeal. Defendant Smith's second assignment is identical to defendant Emery's second assignment of error, both of which complain of the erroneous admission of evidence of other crimes. In this regard, the record reflects that the prosecutor asked Ms. Martin, "Why pick your apartment?" and she replied, "Because it was the closest one after they took off from taking

the woman's purse." Both defendants objected to this statement and their objections were sustained with the jury being admonished to disregard it.

■ We are of the opinion that it was proper to prove the purse snatching as it tended to show the defendants' motive and intent in committing the crime charged herein, kidnapping. See, *Roulston v. State*, Okl.Cr., 307 P.2d 861 (1957).

Both defendants also urge on appeal (defendant Smith's third assignment and defendant Emery's fourth assignment) that their pretrial motions for severance should have been granted.

In *Chance v. State*, Okl.Cr., 539 P.2d 412, 416 (1975), this Court stated that severance is not a matter of right on the part of defendant, but rests entirely in the judgment of the trial court and a denial of a motion for severance will not be disturbed on appeal unless there is a clear showing of an abuse of discretion. We note first that both defendants testified. Both denied complicity in the crime and both stated that Ms. Martin and Mr. McDaniel came to their house voluntarily. Additionally, their respective testimony was for the most part compatible. Neither defendant attempted, while testifying, to show that the other was primarily to blame.

Defendant Emery urges, however, that defendant Smith's cross-examination of the State's witnesses clearly reveals that defendant Smith's trial strategy was to point the accusatory finger at defendant Emery. To buttress this contention, defendant Emery points to several instances where on cross-examination of the State's witnesses defendant Smith, through his counsel, elicited answers indicating that defendant Emery did most of the talking and that defendant Smith was very apologetic when he informed the victims, at the point of a gun, that they would have to accompany him.

Defendant Smith urges that as to him severance should have been granted for the following reasons: (1) defendant Emery's lengthy record for prior convictions as con-

trasted with defendant Smith's total lack thereof; (2) the antagonism between the defendants' defenses, as outlined above, and (3) the fact that there were two defendants and, consequently, two defenses, caused such confusion in the trial court's mind that it announced to the jury that defendant Smith would present evidence, when it was defendant Smith's intention to not do so.[1]

■ The facts herein do not even approach those in *Murray v. State*, Okl.Cr., 528 P.2d 739 (1974), cited by defendant Emery. There, each co-defendant's testimony directly implicated the other. Here, as noted above, neither co-defendant testified that the other was wholly or even partially responsible, both denying complicity in the crime. We thus cannot say upon review of this case that the defenses of Smith and Emery were so conflicting that the trial court abused its discretion in denying each defendant's motion for severance.

■ Concerning defendant Smith's contention that he was prejudiced when he was forced to trial with a co-defendant who was charged after former conviction of a felony, we find relevant *Curcie v. State*, Okl.Cr., 496 P.2d 387 (1972). There, we held that the trial court did not abuse its discretion by denying severance which was requested solely for the reason that the co-defendant had been convicted of a felony. In *Curcie*, the co-defendant was not, as in the instant case, charged after former conviction of a felony; however, defendant Smith herein has failed to demonstrate prejudice from the simple fact that he, as well as defendant Emery, was tried in a two-stage proceeding. Indeed, defendant Smith's three year term, as contrasted with defendant Emery's 38 year term, demonstrates that no prejudice resulted.

In order to properly deal with defendant Smith's final proposition—that the denial of a severance confused the court to the point where it erroneously commented on defendant Smith's right to testify—it is necessary to first decide whether such error in fact occurred. We are of the opinion that it did

---

1. This is also raised as a separate assignment of error by defendant Smith, infra.

not. The comment complained of by defendant Smith in his first assignment of error is reflected in the record as follows:

". . . Remember the State has rested but there is still much more evidence to be put into the Record as I anticipate, and that you are to withhold your forming of opinions until all the evidence is in, and make certain that you don't make any independent investigation or talk to any person, including members of your own family, about this case."

◼ We are of the opinion that the statement "there is still much more evidence to be put into the record" did not, within the context of this case, amount to a comment on defendant's right to testify. Prior to the statement being made and out of the hearing of the jury, defendant Emery's counsel indicated to the court that he had a witness he wished to present. As such, the court's comment only informed the jury that the trial was not over, that more evidence was forthcoming, and that they should form no opinions until all of the evidence was in.

The cases cited by defendant Smith are inapposite. In *Hanf v. State*, Okl.Cr., 560 P.2d 207 (1977), the prosecutor indicated to a juror during voir dire that "if the defendant wishes to put on evidence he has the right to do so." In *Patman v. State*, 95 Okl.Cr. 415, 247 P.2d 308 (1952), the court instructed the jury that a defendant need not testify and that no inference may be drawn therefrom. And, while in *Garner v. State*, Okl.Cr., 500 P.2d 865 (1972), there is language seemingly indicating that a comment by the court or prosecutor which *forces* a defendant to testify is error, the opinion goes on to state that the comment made therein was not of such character. So too, in the instant case it cannot fairly be said that the court's comment had the effect of "forcing" defendant Smith to testify. Defendant Smith's first assignment of error is therefore without merit.

Having concluded that there was no erroneous comment by the court on defendant's right (not) to testify, we return to defendant Smith's final proposition in connection with his contention that the trial court erred in failing to grant a severance. The proposition is that the failure to grant the severance caused such confusion in the court's mind that it erroneously stated to the jury that defendant Smith would testify when it was defendant Smith's intention to not testify. Since we have held that the court's comment was not error, then it is apparent that no prejudice flowed to the defendant in this regard from the court's denial of defendant Smith's motion for severance. It was therefore not error to deny each defendant's motion for severance, and defendant Smith's third assignment of error and defendant Emery's fourth assignment of error are without merit.

Defendant Emery's third assignment of error alleges that the prosecutor committed reversible error by announcing to the court and to the jury, prior to the testimony of the defendant's first witness, that in his opinion the witness should be advised of her right not to incriminate herself. Defendant Emery's first witness was Runita Fluellen, who stated that she was his girlfriend. Her testimony essentially exculpated both defendants. However, on cross-examination the witness admitted that shortly after the kidnapping she gave a written statement to police which contradicted her trial testimony. She testified that the written statement was false and that she lied to police because she was mad at both defendants.

Defendant Emery cites no authority in support of his contention that it was error to advise Ms. Fluellen of her rights in the jury's presence. In *Sandefur v. State*, Okl. Cr., 461 P.2d 954 (1969), and many other cases, we noted that it is necessary to support contentions of error with both argument and citation to authority, and that where this is not done and it is apparent that the defendant has been deprived of no fundamental right, this Court will not search for authority to support the defendant's mere assertion that the trial court has erred.

◼ In the present case, we are unable to conclude that defendant Emery was deprived of a fundamental right. Defendant Emery's third assignment of error is without merit.

Defendant Smith's fourth and final assignment of error complains of an accumulation of error. Since we have heretofore held that defendant Smith's first three assignments are without merit, it is apparent that this one is without merit as well.

We have left but one assignment of error, defendant Emery's first, and we have considered it last since it presents the most serious problem. During cross-examination of defendant Emery, the prosecutor confronted him with a letter written by Emery to defendant Smith. The letter was written while they were in jail and was given by Emery to a jailer for delivery. The letter was given to the prosecutor by the jailer and a photocopy was made, after which it was delivered to defendant Smith. Taken in its most damaging light, the letter is an attempt by defendant Emery to tell defendant Smith how he should testify in order that their stories coincide.

On redirect, in order to rehabilitate defendant Emery's credibility, his attorney attempted to show that the defendant was not so foolish as to put seriously inculpatory matter into a letter written while in jail. The record reflects the following:

"Q. You have been in jail before; right, John?

"A. Yes, sir.

"Q. You realize that any other letter that you send to another inmate is contraband?

"A. Yes, sir.

"Q. You are not stupid enough to send something that would incriminate you; would you?

"A. No, sir."

Immediately thereafter on recross-examination, the following occurred:

"Q. You have been in jail before; haven't you?

"A. Yes, sir.

"MR. RANDALL: May we approach the bench?

"MR. MUSSEMAN: He opened it.

"MR. RANDALL: I was referring to his prior convictions.

"THE COURT: I will permit it. Exception.

"MR. RANDALL: Exception.

"BY MR. MUSSEMAN:

"Q. Sir, July, 1965, you were arrested under the name of John Lee Gray. Felonious assault. You were in jail for that; weren't you?

"A. Yes, sir.

"Q. September the same year—

"MR. RANDALL: Your Honor, I would like to move for a mistrial at this time. I had not opened any of this. I was referring to the times he was in the penitentiary. It is prejudicial, irrelevant, and I move for a mistrial.

"THE COURT: Denied.

"BY MR. MUSSEMAN:

"Q. September 4, 1965, Kansas City, Missouri, under the name of John Lee Gray: Assault. Spent time in jail on that; didn't you?

"A. Yes, sir. I never did no sentences on them.

"Q. You were in jail just like the man asked you?

"A. As far as investigation.

"Q. Answer my questions; would you, please? Nineteen sixty-five, October, the next month, Kansas City, Missouri: Aggravated assault. You were in jail then; weren't you?

"A. Investigation, yes.

"Q. Kansas City, Missouri, November the 1st: Assault with intent to kill. You were in jail then; weren't you?

"A. Yes, investigation.

"Q. December the next month, 1965, Kansas City, Missouri: Rape. You were in jail then; weren't you?

"A. Investigation, yes, sir.

"Q. Then we go all the way to June, 1966, Kansas City, Missouri: Homicide. That's where you took the fall on manslaughter.

"A. Yes, it was something I did. I pleaded guilty to it.

"Q. Nineteen sixty-seven, March: Robbery. In jail, Kansas City, Missouri; right?

"A. Yes, investigation.

"Q. Nineteen sixty-nine, February, Kansas City, Missouri: Attempted rape. They put you in jail; didn't they?

"A. Investigation, yes.

"Q. What do you mean by investigation, John?

"A. Well, it was just—They were just saying that I did this.

"Q. They didn't give you a chance to tell your story; is that what it is?

"A. They were saying that I did this. I never was found guilty on any of those charges. I was only found guilty on what I pleaded guilty to.

"Q. Nineteen sixty-nine, August, Kansas City, Missouri, again under the name of John Lee Gray: Robbery. Convicted of that one; weren't you?

"A. Did I plead guilty to it?

"Q. You were convicted of it; were you not?

"A. If I pleaded guilty to it, yes, sir.

"Q. I can't read the month on this one. Robbery, Kansas City, Missouri. Looks like the first part of 1970. Is that right, John?

"A. Just for investigation. I guess that's right.

"Q. No, I am sorry. It was July, 1970. You were in jail then; weren't you?

"A. For investigation, yes.

"Q. September, 1970, month and a half later, another investigation; Homicide. Kansas City, Missouri.

"A. Investigation. I was held a day, yes.

"Q. Kansas City, Missouri, November: Robbery. Held again for investigation?

"A. Investigation.

"Q. Okay. The next month, December, 1970. John Lee Gray, Kansas City, Missouri: Burglary.

"A. Investigation.

"Q. Nineteen seventy-three, Kansas City, Missouri: Strong armed robbery. Investigation again?

"A. You have the paper.

"Q. You've got the knowledge.

"A. Well, you have to tell me, you know.

"Q. Were you in jail then, sir?

"A. What's that month on it?

"Q. July, 1973?

"A. I pleaded guilty to that case.

"Q. Well, John, I hate to correct you, but that was one you talked your way out of. You were released.

"MR. RANDALL: Your Honor, we object to statement of Counsel. Again we move for mistrial.

"THE COURT: I will sustain the objection.

"BY MR. MUSSEMAN:

"Q. Nineteen seventy-four, more. Denver, Colorado: Assault. Is that you again?

"A. Yes.

"Q. And that's not all; is it?

"A. Well, I am on this case right here.

"Q. And you also pleaded guilty to petty theft; didn't you?

"A. Yes."

Examination of the preceding reveals that some 15 arrests had resulted in three convictions. The fact of these three convictions had been elicited from defendant Emery earlier.

Court's instruction No. 7 is as follows: "Counsel for the State was permitted to ask the Defendant John Lee Emery, on cross examination concerning his incarceration in jails on charges that did not result in convictions. The Court permitted this line of testimony for the sole and only purpose to establish that the Defendant, Emery, was familiar with jail rules, regulations, and procedures.

"You are instructed that the fact that a person has been arrested would be no evidence of his guilt or innocence of the case on trial. Neither could it be used to impeach his credibility as a witness. The fact that the Defendant was arrested on charges that did not result in a conviction is no evidence of wrong doing on the part of the witness, but is only permitted for the very limited purpose to show his acquaintance with jail procedures, and you should consider it in that light and no other."

■ Defendant Emery's objections to this instruction were overruled. As noted in the instruction, a defendant's arrest record cannot be used to impeach his credibility as a witness, *Londo v. State*, Okl.Cr., 562 P.2d 1156 (1977). Nor, of course, can it be used as evidence of guilt. In short, such evidence is totally inadmissible.

Three propositions are advanced by the State in support of their contention that no reversible error occurred. First is that the defendant Emery did indeed "open the door" to the admission of his record of prior arrests. Reliance is placed by the State upon *Brown v. State*, Okl.Cr., 521 P.2d 419 (1974). There, defense counsel inquired of one of the arresting officers whether he had ever arrested the defendant before. Thereafter, on redirect, the court permitted the prosecutor to inquire as to what the officer had arrested the defendant for. We held that the defendant opened up the question and the trial court's ruling was proper.

■ We find the present case totally unlike *Brown v. State*, supra. Here, it cannot be said that defendant's counsel "opened up the inquiry as to the defendant's prior arrest" when he asked the defendant if he were familiar enough with jail procedures to know not to place incriminating statements in letters sent to other inmates. Such questioning by defendant's counsel was, perhaps, self-serving and therefore objectionable; however, by no stretch of legal fiction can it be said that this inquiry opened the door to admission of defendant's lengthy arrest record.

■ The second proposition of the State is espoused in the supposedly curative instruction given by the court, which states that the jury was to consider defendant Emery's arrest record solely to establish that he was familiar with jail procedures. In our opinion, this instruction cured nothing. In the first place, it undoubtedly had the effect of refocusing the jury's attention upon defendant Emery's arrest record. In the second place, it was the *defendant's* contention that he was familiar with jail procedure (and hence would not put incriminating statements in a letter), and not the

State's. It is perhaps permissible for the State to introduce evidence in support of a defendant's theory of the case, however, to allow the State to perform this favor through the introduction of the defendant's record of 13 prior arrests is not only illogical but, we hold, is illegal as well.

After thoroughly reviewing the State's arguments in light of the record, we are unable to accept them. Quintessentially what is involved here is overreaching of the worst sort. There can be no contention that the prosecutor was unaware that evidence of the defendant's prior arrest record was inadmissible except under the most unusual circumstances. Cf., *Brown v. State*, supra; *Fite v. State*, Okl.Cr., 526 P.2d 956 (1974). And yet, countless times this Court has observed the prosecutor seize upon the flimsiest of reasons for introducing such evidence. Why? The answer is obvious. It is because the prosecutor knows the prejudicial and inflammatory effect such evidence will have upon the jury and it is because he knows that conviction is virtually assured when the jury learns that the defendant has been arrested, although not convicted, some 13 times for rape, attempted rape, murder, robbery, and felonious assault.

■ Although it cannot be condoned, it is perhaps understandable when the State's case is weak for a prosecutor to push too hard in this direction. However, in a case such as the one at bar, where the State's case in chief is strong and the defendant's evidence incredible and contradictory, such tactics are incomprehensible. Surely, the prosecutor was aware that he was approaching a forbidden line and surely he was aware of the consequences of erroneously crossing it. Criminal trials are had only at great expense to the State and to the participants, both in time and in money. The public is infuriated when "criminals are set free on a technicality." Reversal of convictions because of bad faith errors by the prosecutor breeds discontent with the judicial system and disrespect for the law. The State urges in its third proposition that in view of the strength of the State's case

and the obvious weakness of the defendant's case that we declare the error of the prosecutor to be harmless. This we cannot do.

The judgment and sentence of Gerald Theodore Smith is *AFFIRMED*.

Insofar as the prejudice afforded defendant Emery occurred in the assessment of punishment, the sentence of John Lee Emery, also known as Robert Lee Lomax, also known as John Lee Gray, is *MODIFIED* from thirty-eight (38) years' imprisonment to ten (10) years' imprisonment and as MODIFIED the judgment and sentence is *AFFIRMED*.

BUSSEY, P. J., and CORNISH, J., concur.